### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **E2 REAL ESTATE PARTNERS** | § | **CASE NO. 10-35718-H5-11** |
| **III, LLC,** | § | **(CHAPTER 11)** |
| | § | |
| **DEBTOR** | § | |

### DEBTOR'S DISCLOSURE STATEMENT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW E2 REAL ESTATE PARTNERS III, LLC, Debtor and Debtor in Possession herein (the "Debtor"), and files the following Disclosure Statement:

I.

### INTRODUCTION

Debtor, as proponent hereby submits its Disclosure Statement in connection with its Plan of Reorganization (the "Plan"). Its Disclosure Statement is being disseminated to all known creditors of Debtor for the purpose of disclosing that information which is material, important and necessary for Debtor's creditors to make a reasonably informed decision in exercising their right to vote upon the Plan which has been filed with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") in its Chapter 11 case.

A. **Code Compliance**. Its Disclosure Statement is distributed pursuant to § 1125 of the United States Bankruptcy Code, 11 U.S.C. § 101, et. seq. (the "Bankruptcy Code"), which requires Debtor to submit to all holders of claims against the Debtor and to those parties who may have an interest in the Debtor, a copy of any proposed plan or a summary of such plan, and a written disclosure statement containing information adequate to enable creditors and other interested parties to make an informed judgment about the plan. The statements contained in its Disclosure Statement are made as of the date hereof, unless another time is specified herein, and neither the delivery of its Disclosure Statement nor any exchange of rights made in connection herewith shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date hereof.

B. **Bankruptcy Filing**. On July 5, 2010, E2 REAL ESTATE PARTNERS III, LLC filed this case as a Chapter 11 case. The Debtor has remained in possession of its property and

has retained control over its ongoing affairs pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108, which provide that the Debtor shall retain possession and management of its property.

C. <u>First Meeting of Creditors</u>. The first meeting of creditors pursuant to § 341 of the Bankruptcy Code in its Chapter 11 case was held on August 17, 2010.

D. <u>Disclosure Statement</u>. Its Disclosure Statement must be approved by the Bankruptcy Court and/or District Court, after notice and hearing, prior to the solicitation of creditors with respect to its acceptance of the Plan.

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY DEBTOR OTHER THAN AS SET FORTH IN ITS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE A CREDITOR'S ACCEPTANCE, OTHER THAN AS SET FORTH IN ITS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY A CREDITOR IN ARRIVING AT HIS/HER OR ITS DECISION, AND ANY SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN WILL INFORM THE BANKRUPTCY COURT, WHICH MAY TAKE SUCH ACTION AS IT DEEMS APPROPRIATE.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED. ALL THE FINANCIAL INFORMATION WITH RESPECT TO THE DEBTOR WAS COMPILED FROM INFORMATION PROVIDED FROM THE DEBTOR'S RECORDS. THE INFORMATION SUBMITTED WITH ITS DISCLOSURE STATEMENT IS DEPENDENT UPON THESE RECORDS. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACIES, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO BE ACCURATE AND TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF, THE INFORMATION CONTAINED HEREIN IS ACCURATE.**

**EXCEPT AS SPECIFIED HEREIN, NO FORMAL APPRAISALS HAVE BEEN UNDERTAKEN ON THE DEBTOR'S PROPERTY. THE VALUES PLACED THEREON AND SUMMARIZED BELOW ARE THE DEBTOR'S BEST ESTIMATE OF THE VALUES OF PROPERTY AS OF THE TIME OF THE FILING OF THE PLAN AND ITS DISCLOSURE STATEMENT.**

**MUCH OF THE INFORMATION CONTAINED HEREIN CONSISTS OF PROJECTIONS OF PERFORMANCE UTILIZING TRENDS AND BEST JUDGMENT CONCERNING FUTURE EVENTS. WHILE EVERY EFFORT HAS BEEN MADE TO ENSURE THAT THE ASSUMPTIONS ARE VALID AND THAT THE PROJECTIONS ARE AS ACCURATE AS CAN BE MADE UNDER THE CIRCUMSTANCES, THE DEBTOR**

**DOES NOT UNDERTAKE TO CERTIFY OR WARRANT THE ABSOLUTE ACCURACY OF ANY PROJECTIONS.**

**YOU ARE URGED TO CAREFULLY READ THE DISCLOSURE STATEMENT, TOGETHER WITH THE ATTACHED EXHIBITS, IN ORDER TO PROVIDE YOU WITH SUFFICIENT INFORMATION TO ENABLE YOU TO DECIDE WHETHER TO ACCEPT OR REJECT THE PLAN. THE PLAN IS NOT PART OF THE DISCLOSURE STATEMENT AND MUST BE REVIEWED INDEPENDENTLY.**

**THE APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT AN ENDORSEMENT OF THE PLAN BY THE COURT NOR IS IT A REPRESENTATION OF THE TRUTH AND ACCURACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.**

E.      <u>Vote Solicitation</u>.  Creditors should read the Disclosure Statement in its entirety prior to voting on the Plan.  No solicitation of votes may be made except pursuant to the Disclosure Statement and § 1125 of the Bankruptcy Code.  No person has been authorized to utilize any information concerning Debtor other than the information contained in its Disclosure Statement.  Creditors should not rely on any information relating to the Debtor, other than that contained in its Disclosure Statement.

F.      <u>Voting</u>.  Creditors may vote for acceptance or rejection of the Plan by filing with the Bankruptcy Court the ballot form, which shall be sent to all creditors.  A description of the voting procedure and deadlines is described below.  As a creditor, your vote is important.  The Debtor urges all creditors to fill in and return the ballot form to Debtor's counsel.  A failure to complete the ballot form and return it to Debtor's counsel does not constitute an acceptance or a rejection of the Plan.  Only those ballots which are timely returned to Debtor's counsel will constitute a vote.  Therefore, it is important that each creditor cast a vote.

G.      <u>Liquidation</u>.  The Debtor believes the Plan described herein will provide creditors an opportunity to receive some payment sooner, and thus at a higher present value than they would pursuant to a liquidation of assets and distribution under Chapter 7 of the Bankruptcy Code.  A liquidation analysis is reflected in Section VII.  The Debtor believes that if the Debtor's assets were liquidated, unsecured creditors would receive nothing.  The Plan should provide the unsecured creditors with a percentage of what they are owed.  A liquidation analysis is attached as Exhibit "A."

II.

<u>VOTING PROCEDURES AND REQUIREMENTS</u>

A.      <u>Ballot and Voting Deadline</u>.  A ballot to be used for voting to accept or reject the Plan will be mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot

and instructions thereon; (2) execute the ballot; and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting purposes.

B.    <u>Creditors Entitled to Vote</u>.  Any creditor of the Debtor whose claim is <u>impaired</u> under the Plan is entitled to vote, if either (i) its claim has been scheduled by the Debtor (and such claim is not scheduled as disputed, contingent or unliquidated), or (ii) it has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for such filing.  Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote unless the Bankruptcy Court temporarily allows the claimant an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion of such creditor whose claim has been objected to by the Debtor or any other party-in-interest.  Such motion must be heard and determined by the Bankruptcy Court prior to the date of the confirmation of the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith, or in accordance with the provisions of the Bankruptcy Code.

C.    <u>Definition of Impairment</u>.  Under § 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization, unless with respect to each claim or equity interest of such class, the plan:

1.    leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.    notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

a.    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in § 365(b)(2) of the Bankruptcy Code;

b.    reinstates the maturity of such claim or interest as it existed before the default;

c.    compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provisions or applicable law; and

d.    does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or interest.

D.    <u>Classes Impaired Under the Plan</u>.  There are seven classes in the Plan.  Classes 2(b), 4(a), 4(b) and 5 are impaired.

4

E.     Votes Required for Class Acceptance.  The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims of that class which actually cast ballots for acceptance or rejection of the plan; i.e., sixty-six and two-thirds percent (66-2/3%) of the dollar amount of claims voted and fifty-one percent (51%) in number of claims voted in each class must vote and accept the Plan.  If this vote is not achieved, the court may still confirm the Plan, at the request of the Debtor, pursuant to § 1129 of the Bankruptcy Code.

III.

CONFIRMATION OF THE PLAN

A.     Confirmation Hearing.  Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on the confirmation of the Plan (the "Confirmation Hearing").  Section 1127(b) provides that any party in interest may object to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B.     Requirements for Confirmation of the Plan.  At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements are as follows:

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payments made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor

under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider.

6.    With respect to each class of impaired claims, either each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor's assets were liquidated on such date under Chapter 7 of the Bankruptcy Code.

7.    Each class of claims or interest has either accepted the Plan or is not impaired under the Plan.

8.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administration expenses and priority claims (other than tax claims) will be paid in full on the Effective Date and that priority tax claims, if any, will receive on account of such claims deferred cash payment, over a period not exceeding five years after the assignment of such claim, of a value, as of the Effective Date, equal to the allowed amount of such claim.

9.    At least one class of claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim of such class.

10.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believe that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied with or will have complied with all of the requirements of Chapter 11 and that the proposal of the Plan is made in good faith.

IV

## SOURCE OF FINANCIAL INFORMATION

The financial information contained in its Disclosure Statement was compiled primarily from information provided from the accounting records of Debtor. The Debtor's accounting is on an accrual basis. Attached as Exhibit "B" is a one-year financial projection showing the Debtor's

estimated income and expenses.  The November 2010 monthly operating report is also attached as Exhibit "C" to show the post-petition financials of the Debtor.

V.

GENERAL INFORMATION

A.    History of the Debtor and Debtor' Post-Petition Activities, Reorganization Efforts and Current Conditions.

# Logan's Pointe Apartments

e2 Real Estate Partners III, LLC was formed in 2008 with the purpose of purchasing Logan's Pointe Apartments.  The original plan was to remodel the property and upgrade the apartment units to create added value and increased rents, manage for a seven to ten year period and sell the property for a positive capital gain.

Logan's Pointe was purchased in August 2008 for $8,350,000 with a total cost of $9,807,354. A loan of $7,475,300 was provided by Arbor Financial Services, a delegated FNMA underwriter and $1,999,939.27 was provided by the equity partners and credits at closing. Additional equity of $502,400 was contributed for planned rehabilitation post-purchase.  The property was 89% occupied at the time of purchase.

Three weeks after the purchase, Logan's Pointe Apartments was severely damaged by Hurricane Ike.  Subsequently, the City of Baytown required the eviction of tenants and the removal of 67 apartment units due to extensive hurricane damage.  This dropped the occupancy to 67%.  Arbor had not yet sold the loan to FNMA and could not do so after Hurricane Ike as the property would no longer appraise for property condition.

Repairs to the property began immediately.  Funds from the remodel escrow were authorized by Arbor Financial Services to be used for repairs with the expectation that damage claims submitted to Lexington Insurance, the property's insurance carrier, would be paid in a timely manner.

By the middle of the fourth quarter of 2008, it became apparent that repairs were going to exceed remodel escrow funds held by Arbor.  Arbor informed e2 that the property needed to be repaired by January 31, 2009, to a condition that could be recertified as "Pre-Ike" value in order for Arbor to sell the loan to FNMA and if the deadline was not met, Arbor would be forced to initiate foreclosure proceedings.  Efforts were made by the management of e2 and this deadline was achieved.  During the first quarter of 2009, Lexington paid an initial damage claim of $281,000 and Arbor released approximately $245,000 for repairs.

7

However, now there were not adequate funds for the planned remodeling until Lexington paid the damage claim. Ongoing discussions with Lexington resulted in a large difference of opinion as to the value of the damages incurred. e2 damage estimates were $2,550,000 and Lexington estimates were in the $1,068,000 range. Ultimately, in June of 2009, a lawsuit was filed against Lexington for failure to resolve the claim to e2's satisfaction.

During this time, Logan's Pointe Apartments was experiencing the economic downturn that started in mid September 2008 and continues to the present time. The Baytown market has been especially hard hit. Occupancy in the Baytown submarket has fallen from 82.5% in the second quarter of 2008 (evaluated at time of purchase) to 77.3% in the third quarter of 2010 (O'Connor & Associates). Despite all efforts, Logan's Pointe occupancy continued to fall to 55.5% by the fourth quarter of 2009.

In order to continue recovery efforts, the equity partners in Logan's Point contributed $600,000 during the second and third quarters of 2009 to fund monthly cash flow shortfalls. Arbor continued to hold approximately $350,000 in rehabilitation/repair escrowed funds and was unwilling to allow utilization of those funds for property rehabilitation. In the fourth quarter of 2009, an impasse was reached between e2's then managing member and Arbor regarding the recovery of Logan's Pointe. The e2 managing member resigned and a new managing member was put in place by the equity partners. A property management change was evaluated by the new managing member in the first quarter of 2010 and put in place April 1, 2010. Occupancy with the previous management company started the first quarter of 2010 at 58.6%. With current property management, occupancy through the first week of January 2011 is 78% (199 units of 256 total units). If one were to measure our current occupancy against available units, we are at 85%, nearly 8% above the submarket average of 77.3%!

Logan's Pointe has had nearly ten percent (22 units) unavailable to lease since the purchase in 2008 due to foundation repairs and high rehabilitation costs. These units were to be repaired under the original property rehabilitation plan but could not be justified during 2009 with the cash flow stress the property was experiencing. Therefore, only 91% of the property is currently available to lease. Current estimates to bring these last 22 units online are $136,106 (average of $4,960 per unit and $26,977 in foundation repair).

The second quarter of 2010 began with our current managing member having to negotiate one month's debt service payment relief from Arbor to apply those funds to property repairs. Negotiations continued with Arbor for the release of funds for rehabilitation and/or use to pay debt service while e2 made efforts to improve occupancy and cash flow. The ongoing negotiations failed and e2 decided to discontinue debt service payments and redirect those funds into property improvements. Continued requests to Arbor to bring FNMA into the negotiations were denied until late May 2010. FNMA then made contact with e2 but set untenable terms for further discussion.

The postponed court date for the lawsuit between e2 and Lexington was September 2010. The valuation was still being estimated at approximately $2,550,000 but would not be available to e2 in the necessary timeframe.

In June, Arbor posted Logan's Pointe for foreclosure on July 6, 2010. e2 made efforts to discuss alternatives as late as July 1, 2010, with FNMA but was unable to make any progress. In order to avoid foreclosure and lose the ability to utilize escrowed rehabilitation funds from Arbor and insurance claim proceeds to pay debt service and pay unsecured creditors, e2 Real Estate Partners III, LLC filed for bankruptcy on July 5, 2010.

## Logan's Pointe Apartments Repairs and Property Improvement

Logan's Pointe Apartments is a Class C complex with 256 units. Until recently, only 212 of the units have been available to lease. Forty-four units required moderate to extensive rehabilitation. Twenty-two of the 44 units have recently been refurbished. Two Hundred and Thirty-Four (234) units are now available to lease.

Twenty-two (22) units still require extensive rehabilitation along with foundation repairs. The cost estimate for the 22 remaining units is $136,106 (average of $4,960 per unit plus $26,977 in foundation repair). The time frame to make these repairs is estimated between 60 to 90 days. When all units are available to lease, gross potential rent (GPR) is $146,880 at current lease rates with concessions. With only 234 units available, only 91% of GPR is achievable ($124,025). Payout for the 22-unit repair is approximately 12 months at full occupancy and 15 months at 80%.

Logan's Pointe Apartments requires property improvement to sustain and increase rental revenue. Curb appeal needs attention. In addition to the 22 unit rehabilitation project described above, we are proposing the following for immediate action:

## Immediate Rehabilitation Required

Entry Way Landscaping- $3,080
Foundation repairs- $26,977.50
HVAC replacement and pad repair along entry way to leasing office- $9,185
Parking lot repairs along entry way and areas immediately visible from office- $7,260
Stairs repairs to second floor landings- $8,580
Club Room Rehab- $15,290
Office Remodel- $26,950
Tennis Court repairs- $1,485
Pool Area repairs- $1,250
Gazebo Area rehab- $3,500
Contingency Fee 10%- $10,335.75
**Total Immediate Rehabilitation Cost- $113,913.25**

## Post-Immediate Rehabilitation Required

Upon completion of the above, the following will be addressed over the next six months:

Air Conditioners (Air Handlers and Condensers)- $96,650, as needed
Exterior Painting, $45,000
Exterior Carpentry, $60,000
General parking lot repairs- $21,400
Playground, $20,000
Grounds, $17,000
Lighting, $5,000
Pool furniture, $3,000
Management Fee 10%- $26,805
**Total Post-Immediate Rehabilitation- $268,050**

## e2 Real Estate Partners III, LLC vs Lexington Insurance

Logan's Pointe Apartments was damaged by Hurricane Ike in September, 2008. Repairs to the property began immediately. Some funds from the remodel escrow funds were authorized by Arbor Financial Services to be used for repairs with the expectation that damage claims submitted to Lexington Insurance, the property's insurance carrier, would be paid in a timely manner.

By the middle of the first quarter of 2009, it became apparent that the costs of necessary repairs to Logan's Pointe Apartments were going to exceed the amount Lexington was prepared to pay.

e2 damage estimates were in the $2,550,000 range and determined as follows: $1,900,000 property damage estimate by Brock Thomas, our adjustor; $250,000 drying out by Ogden Builders; $400,000 for business interruption.

Lexington's estimate for damages and deductible was $1,067,871.26 and was determined as follows: $579,000 policy deductible; $207,871.26 for temporary repairs; $281,000 for property damage, all prior to lawsuit filing. Ultimately, in June of 2009, a lawsuit was filed against Lexington for failure to resolve the claim to e2's satisfaction.

The lawsuit has been split into two parts, Actual Damages and Bad Faith Damages. Settlement was reached in the third quarter of 2010 for the Actual Damages portion of the lawsuit. The settlement amount was $1,097,871.20: Lexington Insurance (the first tier carrier) $207,871.26 (paid for temporary repairs post-lawsuit filing); Max Specialty (the second tier carrier) $800,000; Cunningham Lindsey (adjuster) $90,000.

Rationale for acceptance of this amount was based upon adding this settlement amount $1,097,871.20 to the required policy deductible ($579,000) and payments made by Lexington prior to the lawsuit being filing ($207,871.26 and $281,000). This totals $2,165,742.46, an amount e2 felt was adequate for the Actual Damages as we avoided the risk of the appraisal arbitration process. After legal fees, e2's share of the Actual Damages settlement was approximately $350,650, received in the third quarter of 2009.

Bad Faith Damages litigation with Lexington Insurance continues. The trial had been set for January, 2011, but has been postponed. A new trial date has not yet been set by the Court. The gross value, if successful, could be in the $1,500,000 range, less 40% legal contingency fees plus additional legal expenses.

## Current Conditions for Logan's Pointe and Baytown Submarket

Logan's Pointe is currently 78% occupied. 212 units were available for lease on Dec 1, 2010, and an additional 22 units have been repaired and are available as of December 31, 2010. Twenty-two (22) units remain unavailable due to extensive repair/rehabilitation and foundation repair at a cost of $136,106 ($109,129 for repairs and $26,977 in associated foundation repairs). Revenue generating capability for the 22 units is $11,119 per month with current concessions, a 12-month payout with all units leased and 15 months at 80%.

Logan's Pointe is exceeding submarket occupancy averages with actual units available considered; this is expected to continue as the last 22 units are brought on-line

Competition is fierce in this submarket; concessions are currently one month's free rent and two month's free rent is being promoted by one of our competitors

Current advertising and resident referral plans are expected to continue as they have resulted in the above average occupancy for Logan's Pointe. Current trends suggest that these concessions will continue until the Baytown economy improves, an event not predicted to occur before the second half of 2011.

## Plan to Emerge from Bankruptcy

The FNMA property appraisal prepared by CB Richard Ellis dated July 2, 2010, indicates the "as is" value of the property is $4,050,000 and the "as stabilized" value of the property is $4,680,000. The appraisal is set out as Exhibit "D" hereto. e2's plan of reorganization will honor the $4,050,000 appraised value as FNMA's secured claim and the deficiency as a Class 4 unsecured claim. The Debtor will pay 5% interest on FNMA's secured claim, with interest-only payments in the amount of $16,875.00 for 12 months beginning on the first day of the first month following 60 days after the Effective Date of the Plan; Thereafter, e2 will pay

principal and interest at the rate of 5% on the secured claim for 30 years in equal monthly payments of $21,741.28 with the first payment of principal and interest being due and payment on the first day of the 13th month following 60 days after the Effective Date of the Plan.

FNMA's deficiency claim will be classified as a Class 4 general unsecured claim and will be paid a guaranteed amount of $84,000. If the Debtor is successful in its bad faith insurance litigation, FNMA may realize a total payment of $251,791.05. The $84,000 will be paid in 60 equal monthly payments of $1,400 per month beginning on the 15th day of the first month following 60 days after the Effective Date of the Plan. The balance of up to $167,791.05 will be paid according to the successful recovery of net proceeds by the Debtor from the bad faith insurance litigation.

e2's plan requires the turnover of $465,758.88 swept by FNMA from Arbor Financial on or about May 25, 2010. Said swept funds were originally intended for taxes and insurance escrow ($88,763.91), Replacement Reserves ($19,974.92), Improvement Repair Holdback ($21,030.90), Renovation Reserve ($16,959.98), Operating Deficit Reserve ($60,638.03) and Insurance Loss Holdback ($258,391.14). e2 proposes to use the Tax and Insurance escrow for same. e2 proposes to use the Replacement Reserve, Improvement Repair Holdback, Renovation Reserve and Insurance Loss Holdback, a total of $316,356.94, for repairs and rehabilitation. e2 will use the Operating Deficit Reserve to reimburse the Debtor's operating deficit incurred during pre-confirmation operations. An accompanying spreadsheet with financial projections is attached as Exhibit "B".

The Debtor has no affiliates.

VI.

SUMMARY OF CLAIMS AND ASSETS

     A.   <u>Pre-petition Liabilities</u>.  The prepetition liabilities scheduled by Debtor are reflected in Exhibit "E" attached hereto.

     B.   <u>Post-Petition Liabilities</u>.  Debtor has not incurred any additional claims post-petition except for quarterly fees owed to the United States Trustee. Debtor will continue to pay the U.S. Trustee fees quarterly until its case is closed.

     The Reorganized Debtor shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as its Bankruptcy Court enters a final decree closing its Chapter 11 case, or enters an order either converting its case to a case under Chapter 7 or dismissing its case. After confirmation, the Reorganized Debtor shall file with the Bankruptcy Court and shall serve on the United States Trustee a financial report for each quarter, or portion thereof, that its Chapter 11 case remains open in a format prescribed by the United States Trustee.

C.      Pending Litigation and Contingent Liabilities.   There is no pending litigation against the Debtor and none is expected to ensue in the future.

D.      Assets of Debtor.  Schedules A and B are attached hereto as Exhibit "F" and show the assets of the Debtor.

E.      Revesting of Assets.  The Plan provides that on the Effective Date, the property of the estate of the Debtor, including the property included in the Plan as well as subsequently acquired, shall revest in the Reorganized Debtor, subject to the following sentence.  Upon any subsequent conversion to a case under Chapter 7, all assets revesting in the Reorganized Debtor under the Plan or subsequently acquired shall pass to the Chapter 7 trustee as property of the Chapter 7 estate, provided, such property and other assets shall remain subject to those Claims, Liens, and encumbrances as allowed and restructured in the Plan and as specified herein.

VII.

LIQUIDATION ANALYSIS

Typically, a liquidation of a Debtor' assets is handled under Chapter 7 of the Bankruptcy Code.  In such a case, a Chapter 7 Trustee (the "Trustee") is appointed who seizes control and possession of the estate's assets, liquidates them, and then pays creditors from the available proceeds.  The unsecured creditors will get nothing in a Chapter 7 proceeding.  A liquidation analysis for Debtor is attached hereto as Exhibit "A".

VIII.

ACCOUNTING METHOD OF DEBTOR

The Debtor keeps its books and records on an accrual basis rather than on a cash basis.

IX.

PREFERENCES, FRAUDULENT TRANSFERS AND OTHER VOIDABLE TRANSFERS

The Debtor has reviewed its books and records and has determined that no causes of action exist for preference, fraudulent transfers or other voidable transfers.

X.

SUMMARY OF PLAN

The following summary of certain provisions of the Plan does not purport to be complete. The provisions of the Plan, including definitions of certain terms which are incorporated by reference as a part of the summary, are terms which are qualified in its entirety by such reference.

A.     Identity of Proponent.  E2 REAL ESTATE PARTNERS III, LLC is the Debtor and proponent of the Plan.  The Plan was filed contemporaneously with this Disclosure Statement.

B.     Classification and Treatment of Claims.  The Plan establishes seven classes for claims and interests.  Such classes of claims and interests are outlined below.

Class 1.

Administrative Claims

Margaret M. McClure

Claim of Margaret M. McClure, Attorney at Law, for representing the Debtor in this bankruptcy proceeding under § 507(a)(1).  Ms. McClure holds $20,000 (less the $1,039 paid for the filing fee) in a retainer to apply toward her fees and expenses. Ms. McClure anticipates earning approximately $85,000 in fees and expenses for services rendered in this proceeding.

U.S. Trustee Fees

All U.S. Trustee fees will be paid timely through the closing of this proceeding.

Class 1 Claims are not impaired

Class 2(a)

Secured Creditors – Ad valorem taxes

Galveston County

This creditor is owed $43,475.09 for 2010 property taxes.  FNMA is holding this amount in escrow and its counsel has assured the Debtor in writing that these taxes will be paid in full the week of January 17, 2011.  If FNMA does not pay these taxes as agreed, the Debtor will seek a Court order requiring the turnover of the escrowed funds to pay these taxes in full.

Texas City Independent School District

This creditor is owed $41,400.03 for 2010 property taxes. FNMA is holding this amount in escrow its counsel has assured the Debtor in writing that these taxes will be paid in full the week of January 17, 2011. If FNMA does not pay these taxes as agreed, the Debtor will seek a Court order requiring the turnover of the escrowed funds to pay these taxes in full.

Harris County, et al.

These creditors are owed $52,389.26 for 2010 property taxes. FNMA is holding this amount in escrow and its counsel has assured the Debtor in writing that these taxes will be paid in full the week of January 17, 2011. If FNMA does not pay these taxes as agreed, the Debtor will seek a Court order requiring the turnover of the escrowed funds to pay these taxes in full.

Class 2(a) is not impaired (provided FNMA pays these taxes in full before January 31, 2011 as the Debtor has been assured by its counsel)

Class 2(b)

Secured Creditors – Mortgage

Arbor Commercial Mortgage, LLC as Special Servicer for Fannie Mae

This creditor claims to be owed $8,984,6766.60 as the mortgage holder for the Debtor. e2 will pay this creditor's secured claim of $4,050,000, based on this creditor's appraisal dated July 2, 2010, prepared by CB Richard Ellis.. The remainder of this creditor's claim will be paid as a general unsecured claim. The Debtor will pay 5% interest on FNMA's secured claim of $4,050,000, with interest-only equal monthly payments in the amount of $16,875.00 for 12 months beginning on the first day of the first month following 60 days after the Effective Date of the Plan. Thereafter, e2 will pay principal and 5% interest on the secured claim for 30 years in equal monthly payments of $21,741.28 with the first payment of principal and interest being due and payment on the first day of the 13th month following 60 days after the Effective Date of the Plan.

Class 2(b) is impaired

Class 3

Priority Unsecured Creditors

There are no priority unsecured creditors.

Class 4(a)

General Unsecured Claim of Arbor/FNMA – Mortgage Deficiency Claim

The Debtor and these creditors disagree on the amount of the deficiency owed. Regardless, the Debtor intends to pay these creditors $84,000 in 60 equal monthly payments of $1,400 beginning on the 15th day of the first month following 60 days after the Effective Date of the Plan. The Debtor will also pay these creditors $167,791.05 in a lump sum payment out of the net proceeds of any recovery the Debtor may receive from the bad faith insurance lawsuit, as long as there is a net recovery after legal fees and expenses of litigation to the Debtor of at least $800,000. For every dollar in net recovery after legal fees and expenses of litigation received by the Debtor less than $800,000, the $167,791.05 will be reduced by a dollar.

Class 4(a) is impaired

Class 4(b)

General Unsecured Claim of Vendors

The total owed to vendors is $251,791.05. The Debtor intends to pay these vendor creditors $84,000 pro rata in 60 equal monthly payments of $1,400 beginning on the 15th day of the first month following 60 days after the Effective Date of the Plan. The Debtor will also pay these vendor creditors the balance of their claims in the amount of $167,791.05 in a lump sum payment out of the net proceeds of any recovery the Debtor may receive from the bad faith insurance lawsuit, as long as there is a net recovery to the Debtor after legal fees and expenses of litigation of at least $800,000. For every dollar in net recovery after legal fees and expenses of litigation received by the Debtor less than $800,000, the $167,791.05 will be reduced by a dollar.

Class 4(b) is impaired

Class 5

Insider Claims

All insider claims are subordinated to all other classes. No insider claim will be paid through the Plan.

Class 5 is impaired

Any claim in any of the Classes may be paid in accordance with any agreement for waiver, deferral, installment payment or otherwise as agreed between the holder of any such claim and the Debtor. Any such agreement made prior to the Effective Date will be made the subject of a motion in compromise filed with the Court and notice to the creditors and all other parties in interest who have filed with the Court requests for receipt of all notices, in accordance

16

with § 102 of the Bankruptcy Code and Bankruptcy Rules 2002 and 2019(a) and Local Rule 2002, upon five (5) days notice, without the necessity of modification of the Plan.

XI.

FEASIBILITY OF PLAN AND RISK

Almost by definition, a Plan which proposes as an alternative to Chapter 7 liquidation of the Debtor is feasible as that term applies to bankruptcy proceedings.  However, there is an inherent risk that the Plan may fail if the economy does not recover or there are other unforeseen disasters.

XII.

ALTERNATIVES TO PLAN

A.    Conversion.  See discussion under Section VII.

B.    Dismissal.  Dismissal of the proceedings would, in the judgment of the Debtor, lead to an unsatisfactory result.

C.    The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor.  The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance as to what turn the proceedings will take if the Plan is rejected.  If you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge it upon the Court, you should consult your independent counsel. Attached hereto as Exhibit "B" are Debtor's financial projections for one year.

XIII.

CONDITIONS TO CONFIRMATION

The Bankruptcy Code contains, among other things, two criteria which a Debtor must meet before the Bankruptcy Court may confirm the Plan.  First, unless every holder of a claim votes to accept the Plan, the amount to be received under the Plan by each holder of a claim or interest must not be less than the amount such holder would have received had the Debtor's assets been liquidated pursuant to Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies its requirement.

The second criteria which the Bankruptcy Court must find has been met is that the Plan has met the feasibility standard; that is, the confirmation is not likely to be followed by liquidation

17

or the need for further financial reorganization.  The Debtor believes that its Plan will be viable and that its requirement has been met.

XIV.

EFFECT OF CONFIRMATION

Upon the date of the final order confirming the Plan:

1.      The provisions of the Plan shall bind the Debtor and any creditor, whether or not they have accepted the Plan;

2.      Except as otherwise provided in the Plan, all of the Real and Personal Property, and any other property or assets of the Debtor shall vest in the Debtor;

XV.

TAX EFFECTS OF THE PLAN

The implementation of the Plan does not have significant federal income tax consequences on the Debtor.  Creditors are urged to seek their own accounting professionals to determine if there will be any significant federal tax consequences on the creditors under the Plan.

XVI.

REJECTION AND ASSUMPTION OF EXECUTORY CONTRACTS AND LEASES

On the Effective Date, the Debtor shall be empowered to assume or reject, within thirty (30) days, any and all executory contracts and leases not previously assumed.  The Debtor will notify all parties affected by such a rejection by filing a written notice of rejection and serving such notice on those parties by certified mail, return receipt requested.

All parties to any contract or lease rejected will have thirty (30) days from the rejection of its executory contract or lease in which to file a Proof of Claim for damages, if any, resulting from rejection of the contract or lease.  Such claim will be subject to the limitation imposed by the Bankruptcy Code and all other applicable laws, rules and regulations.

The Debtor shall be permitted to negotiate the repayment of arrearages owed on any of the executory contracts or leases that it decides to assume, provided the payment of same does not jeopardize the payments of any claims set forth herein.

XVII.

## OTHER PROVISIONS

Notwithstanding confirmation of the Plan, the court will retain jurisdiction (i) to determine the allocability of claims upon an objection by a party-in-interest; (ii) to determine requests for payment of administrative expenses and claims, including compensation, entitled to priority under § 507(a)(1) of the Code; (iii) to resolve disputes regarding interpretation of the Plan; (iv) to modify the Plan; (v) to implement provisions of its Plan; (vi) to adjudicate any cause of action brought by the Debtor or Trustee as representatives of the estate; (vii) to enter a final decree; and (viii) for other purposes.

XVIII.

## BAR DATE FOR FILING PROOFS OF CLAIM

Pursuant to Bankruptcy Local Rule 3003, any creditor desiring to receive a distribution under the provisions of its Plan, whose claim is not evidenced by a Court-authorized order or the Debtor's schedules, must file a proof of claim or request for compensation with the Bankruptcy Court within ninety (90) days after the date set for the meeting of the creditors.  Unless a claim is listed as disputed, contingent or unliquidated, each secured creditor's claim will be allowed in the absence of filing of a proof of claim in a different amount or status on or before the last day fixed for filing claims.  Claims listed as disputed, contingent or unliquidated will not be allowed unless a proof of claim with all supporting documents was filed or the claim was scheduled by the Debtor.  In the event a creditor has filed a proof of claim in these proceedings with which the Debtor disagrees, the Debtor shall file an objection to said claim not later than thirty (30) days after confirmation of the Plan.

Any proof of claim which is not or has not been timely filed or scheduled shall be of no force and effect.  No distribution will be made to any creditor that has not timely complied with its provision.

The failure of Debtor to object to any claim filed herein does not prejudice the Debtor's rights to proceed against any party regarding any causes of action that they may have had at the time its case was filed or that may have accrued during the pendency of its case against any creditor.

XIX.

MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

Implementation of the Plan requires entry of an order by the Bankruptcy Court confirming the Plan.  The Plan is to be implemented, if accepted and approved by the Bankruptcy Court, in its entire form on the Effective Date as defined in the Plan.

XX.

MODIFICATION OF DISCLOSURE

The Debtor may propose amendments to or modification of its Disclosure Statement at any time prior to the confirmation, with leave of the court.  After confirmation, the proponent may, with the approval of the court, so long as it does not materially or adversely affect the interest of the creditors or other parties-in-interest as set forth herein, remedy any defect or omission, reconcile any inconsistencies in its Disclosure Statement, or in the order confirming its Disclosure Statement, in such a manner as may be necessary to carry out the purposes and intent of its Disclosure Statement.

XXI.

CONCLUSION

The Debtor believes that approval of its Plan will provide an opportunity for creditors to receive more in payment on account of the claims than would be received in a liquidation by a Chapter 7 Trustee.

This Disclosure Statement is subject to the approval by the Bankruptcy Court after notice and hearing.

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The foregoing is a summary of the Plan of Reorganization and is not a substitute for the Plan of Reorganization.  The Plan of Reorganization contains additional provisions and each creditor should review and study the provisions of the Plan of Reorganization with particularity.

Respectfully submitted its 18th day of January, 2011.

/s/ Margaret M. McClure

_____

MARGARET M. MCCLURE
State Bar No. 00787997
909 Fannin, Suite 3810
Houston, Texas 77010
(713) 659-1333
(713) 658-0334 (fax)
Email:  Margaret@mmmcclurelaw.com

ATTORNEY FOR DEBTOR